# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 12, 2015 Session

## PHILLIPPE ROGERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2271      Seth Norman, Judge**

---

**No. M2014-01445-CCA-R3-PC – Filed July 2, 2015**

---

The petitioner, Phillippe Rogers, appeals the denial of post-conviction relief from his 2008 Davidson County Criminal Court jury convictions of both conspiracy to sell and possession with intent to sell 300 grams or more of cocaine, claiming that he was denied the effective assistance of counsel.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Cynthia M. Fort (on appeal and at trial) and Joseph L. Morrissey, Jr. (at trial), Nashville, Tennessee, for the appellant, Phillippe Rogers.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Dan Hamm and Andrea Green, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The evidence at the petitioner's jury trial revealed that members of the Metropolitan Nashville Police Department ("Metro") drug task force began wiretapping Jerry Smith's telephone conversations on November 5, 2004, to further their investigation into Mr. Smith's drug activity.  *State v. Phillippe Rogers*, No. M2009-00101-CCA-R3-CD, slip op. at 2-3 (Tenn. Crim. App., Nashville, Aug. 19, 2010), *perm. app. denied* (Tenn. Jan. 13, 2011).  On November 19, the task force intercepted calls between Mr. Smith and the petitioner in which the two men discussed a cocaine delivery from Atlanta to Nashville that was set to take place on November 20.  *Id.*, slip op. at 3.  Through the testimony of task force Sergeant James McWright, the State presented multiple recordings of wiretapped conversations:

In the first call, the [petitioner] left an electronic voice mail message on Mr. Smith's telephone in which he told Mr. Smith, "It's a done deal." The call was recorded at 12:36 a.m. on November 10, 2004.

In the call between Mr. Smith and Jeremiah Milan, another conspirator, recorded at 10:19 a.m. on November 20, 2004, Mr. Smith informed Mr. Milan that "ain't none come through yet," and Mr. Milan asked, "Roger and them still got them five?" Sergeant McWright explained that, based on his experience and training, he understood "five" to mean five kilograms of cocaine.

A telephone call made at 12:44 p.m. on November 20, 2004, between the [petitioner] and Mr. Smith was played to the jury. The [petitioner] told Mr. Smith that he and some other men were running late but that he would call when they arrived in "a little bit."

In another call, recorded at 4:04 p.m. on the same day, Mr. Smith explained that he talked to a "dude" that was running late but was "definitely gonna be here with them nickels." Mr. Smith said that the man would call Mr. Smith that evening. Mr. Milan said that another man was "supposed to give [him] that nine" and that Mr. Milan was following the man. Mr. Milan told Mr. Smith that he "got some stuff lined up." Sergeant McWright explained that "nickel" usually refers to the number five and that he understood the call to mean five kilograms of cocaine. He also said that, from his understanding, Mr. Milan was finding a "nine piece" of cocaine to suffice him until the "nickels" came in from Atlanta.

The next call was recorded at 4:22 p.m. and involved Mr. Smith and the [petitioner]. The [petitioner] told Mr. Smith, "I'm gonna be over there getting me a piece of that hot chicken, probably in about 45 or 50 minutes." The [petitioner] clarified that he would be at "the hot chicken place" and that he would contact Mr. Smith with "the angle." Sergeant McWright testified that, at this point, he and his

officers believed that the men were talking about Prince's Hot Chicken. However, he discovered that while Mr. Smith thought they were meeting at Prince's Hot Chicken, the [petitioner] believed they were meeting at Hotchickens.com, a different hot chicken restaurant.

The next calls between Mr. Smith and the [petitioner] were recorded at 5:37 p.m. and 6:13 p.m. During the first call, the [petitioner] told Mr. Smith that he was 15 minutes from the "chicken house," and Mr. Smith responded, "Okay, I'll be watching." During the next call the [petitioner] told Mr. Smith that he was standing at the door, and Mr. Smith said he could not see him from the parking lot. Sergeant McWright testified that he had monitored Prince's Hot Chicken and did not observe either Mr. Smith or the [petitioner].

A 6:57 p.m. call between Mr. Milan and Mr. Smith reflected that Mr. Smith "didn't know if dude . . . gonna stay here or not." Mr. Milan said, "I know we can move them bastards tomorrow." Mr. Smith stated that he would not be able to "get up there" until 2:00 p.m. the following day because he had church. Mr. Smith mentioned that "the dude" from Atlanta "got four of [them]," and Mr. Milan said he would "try and line them up."

During another call between Mr. Milan and Mr. Smith at 7:25 p.m., Mr. Smith put the [petitioner] on the telephone with Mr. Milan. The [petitioner] told Mr. Milan that he was "sitting with all these clothes in [his] lap" and that he was "trying to see cause them dudes was pushing." The [petitioner] stated that he was trying to "pull it together" because he had "a good situation." He asked Mr. Milan when he could "give [him] concrete." Mr. Milan responded "about 1:30." The [petitioner] then stated that he had met with some people who were "rolling kinda heavy" and "about 65 deep." Sergeant McWright explained that he interpreted this to mean "whoever [the petitioner] was getting [cocaine] from had another 65 kilos, or they could have 65,000 in on those four." He further explained, "I interpreted it that [the petitioner] had gotten four from whoever already had 65 [kilos], but the jury

will have to determine which interpretation they want to believe."

The next call between Mr. Milan and Mr. Smith occurred at 10:14 p.m. In this call Mr. Smith said that he "put him in the [Maxwell House] hotel." He said, "He got some glass, got four of them." Sergeant McWright testified that "glass" referenced "high quality cocaine."

At 10:07 a.m. on Sunday, November 21, 2004, Mr. Smith and Mr. Milan had a telephone conversation wherein Mr. Smith stated that he would go to the hotel to talk to a man after church at appoximately 2:00 p.m. Mr. Milan asked, "How many is it?," and Mr. Smith responded, "Four." Mr. Milan said that he would "round them up."

At 1:10 p.m. on November 21, the defendant called Mr. Smith, and Mr. Smith informed him that he "[j]ust got out" and would "be right over."

*Id.*, slip op. at 3-5.

Metro Officer Roy Michael Lee testified that he was assigned to assist the drug task force with an anticipated drug delivery on November 21, 2004. *Id.*, slip op. at 2. Officer Lee was told "'that a drug delivery was going to be made in Nashville that afternoon and they wanted somebody to stop the vehicle and take the drugs off.'" *Id.* Per Officer Lee's instructions, he waited for Mr. Smith to arrive at the Maxwell House hotel driving a white Lincoln Navigator where Mr. Smith was expected to "pick up narcotics to deliver to another location later that day." *Id.*

Sergeant McWright testified that he and Sergeant Richard Hamilton were surveilling the Maxwell House hotel on November 21 and that at 1:25 p.m., Mr. Smith arrived at the hotel driving a white Lincoln Navigator. *Id.*, slip op. at 5. Sergeant McWright observed Mr. Smith enter the hotel lobby and place a call on the hotel's house telephone. *Id.* Because Sergeant McWright had learned that "'the individuals [they] were looking for was supposed to be staying in Room 717,'" he stationed himself on the seventh floor and saw the petitioner enter Room 717. *Id.* Sergeant McWright then returned to the hotel lobby; he later observed Mr. Smith pull his vehicle to the front of the hotel and saw the petitioner exit the elevator and enter Mr. Smith's vehicle. *Id.* At 1:30 p.m., Sergeant Hamilton observed the Navigator pull behind a dark pickup truck; the petitioner got out of the Navigator and walked to the pickup truck. *Id.*, slip op at 6.

- 4 -

Although Sergeant Hamilton was unable to see what transpired because of an obstructed view, he then saw the petitioner approach the Navigator "'with a black bag in his hand and place[] it in the back behind the passenger's door and then he got in the front passenger's seat and they drove away.'" *Id.*, slip op. at 6-7. The State introduced into evidence photographs of the petitioner placing the bag into the Navigator. *Id.*, slip op. at 7.

As the Navigator pulled away from the hotel, Sergeant McWright followed it "while maintaining radio contact with Officer Lee." *Id.*, slip op. at 5. Sergeant McWright instructed Officer Lee to stop the Navigator "before it left Davidson County but after passing the Old Hickory Boulevard exit on Interstate 24." *Id.* At trial, Sergeant McWright explained that "Mr. Smith's passing the Old Hickory Boulevard exit indicated that he was going to Clarksville where Mr. Milan lived." *Id.* Sergeant McWright also instructed Officer Lee "not to 'burn the wire' because they wanted to continue to use the wiretapped recordings from Mr. Smith's telephone to continue their investigation" and "to only arrest the [petitioner]." *Id.*

When Officer Lee stopped the Navigator as instructed, he asked both Mr. Smith and the petitioner to exit the vehicle, and Officer Lee testified that Mr. Smith consented to a search of his vehicle. *Id.*, slip op. at 2. During the search, Officer Lee located "a 'small little soft-shell briefcase' that contained a small amount of marijuana and some marijuana cigarettes, of which Mr. Smith claimed ownership." *Id.* The drug task force had informed Officer Lee that narcotics would be inside a black bag, but "he recalled that when he found the bag it contained 'computer equipment, like brand new boxes of stuff.'" *Id.* Because he found no other drugs in the vehicle, Officer Lee contacted Sergeant McWright, and, based on that conversation, Officer Lee "cut into one of the computer equipment boxes and discovered a 'brick' of what appeared to be cocaine." *Id.* After field testing the substance and confirming that it was in fact cocaine, Officer Lee continued to search the vehicle and discovered "a total of four bricks of cocaine" that "collectively weighed '[a] little bit over four kilograms.'" *Id.* Sergeant McWright testified that Mr. Smith and the petitioner "were exchanging each kilogram of cocaine for $22,000 or $23,000, but that the 'wholesale value on them was probably between 90 and $100,000.'" *Id.*, slip op. at 6. Tests conducted by the Tennessee Bureau of Investigation crime laboratory revealed that the four bricks contained cocaine and that the aggregate weight of the bricks was 3,992 grams. *Id.*, slip op. at 8.

The State introduced into evidence a recording of a call placed by the petitioner on Mr. Smith's telephone to Mr. Smith's wife at 1:45 p.m. on November 21. *Id.*, slip op. at 5. On the recording, the petitioner "told Mrs. Smith that he was Mr. Smith's partner and that they had been pulled over by police on Interstate 24 on their way toward Clarksville." *Id.*

Officer Lee arrested the petitioner "but released Mr. Smith, explaining that the drug task force wanted Mr. Smith released because his telephone was wiretapped." *Id.*, slip op. at 2. At 2:57 p.m., Mr. Smith placed a call to Terry Rucker "to inform him that the police had arrested the [petitioner], who had 'four of them things,' but that the police did not arrest Mr. Smith." *Id.*, slip op. at 5-6. Officer Lee testified that he was unable to identify any fingerprints on the bricks of cocaine. *Id.*, slip op. at 2. On cross-examination, Officer Lee admitted that the Lincoln Navigator was registered to Mr. Smith; that the task force had wiretapped Mr. Smith's telephone and not the petitioner's telephone; that the petitioner's fingerprints were not found on either the cocaine bricks or the boxes containing them; that nothing indicated the petitioner knew about the drugs; and that the bag containing the drugs had been located behind Mr. Smith's seat. *Id.*, slip op. at 2-3.

Sergeant Hamilton, along with other law enforcement officers, stopped the pickup truck, which was driven by Khalid Shabazz. *Id.*, slip op. at 7. A search of the pickup revealed

> a Walgreen's recipt reflecting a purchase made in Nashville at 11:03 p.m. on November 20, 2004; an envelope from Attorney Paul Gabbert addressed to the [petitioner]; "some type of drive-out tag, August 29th of 2000, from South Lake Ford" in Jonesboro, Georgia; a map of Atlanta, Georgia; an atlas; a bank overdraft statement, a collections bill, and a "warranty notification card" addressed to a Joshua Rabia in Fairbanks, Georgia, which was another name used by the [petitioner]; three mobile telephones and four travel chargers; a pager; rolling papers; an envelope containing marijuana; and a City of Los Angeles parking ticket from September 30, 2004.

*Id.*

Sergeant McWright admitted on cross-examination that both "a beauty pageant and a college sorority event took place at the Maxwell House hotel during the time that he monitored the property." *Id.*, slip op. at 6. Sergeant McWright acknowledged that Mr. Smith "was the primary target" of the investigation and that he used "a target named Eric Davis to get to" Mr. Smith. *Id.* Sergeant McWright explained that "Mr. Smith supplied cocaine to Mr. Davis and that the [petitioner] supplied Mr. Smith." *Id.*

Defense counsel asked Sergeant McWright whether he had "specific knowledge" of the [petitioner's] knowledge of the presence of drugs in the Navigator. Sergeant McWright responded, "[M]y interpretation of what the wire said and my observations – if somebody goes to a truck and removes a bag, I think his intent is pretty clear." He admitted that he could not tell what was in the black bag containing the cocaine by looking at it. He further admitted the boxes containing the bricks of cocaine did not appear "offensive." He stated that he did not observe any suspicious behavior by the [petitioner] at the hotel, and that, had he not known about the recorded telephone calls, he would not have noticed the [petitioner]. He admittted that he had no experiences with the [petitioner] previous to this investigation.

Sergeant McWright also admitted that no officers found any fingerprints on any of the cocaine or boxes. He testified that "[i]t's not surprising . . . . When the drug dealers put it in the boxes, normally they use rubber gloves." Sergeant McWright testified that he understood the [petitioner's] saying he had "clothes in his lap" to mean drugs; however, he acknowledged that the hotel in which the defendant stayed hosted a beauty pageant and "the girls wear nice clothes."

*Id.*

Following the petitioner's arrest, task force Officer Ed Rigsby and Drug Enforcement Agency ("DEA") Agent Brittle interviewed the petitioner. *Id.*, slip op. at 7. The petitioner claimed "that Mr. Smith 'set him up' and 'called the Feds.'" *Id.* The petitioner told the officers that "he was in Nashville to watch his niece participate in a beauty pageant and that he only wanted to meet Mr. Smith to get some hot chicken." *Id.* The petitioner stated that "the cocaine was already in Mr. Smith's truck when he entered the vehicle." *Id.* Officer Rigsby testified that the petitioner initially told him that he was staying at the Maxwell House hotel but that he later stated that he was staying with family in Smyrna. *Id.* Officer Rigsby also testified that the petitioner "could not give a name for the niece he purported to visit." *Id.* Although Officer Rigsby was unable to locate the telephone the petitioner used to make the wiretapped telephone calls, Officer Rigsby did find a cellular telephone of the defendant's in which Mr. Smith's telephone number was programmed. *Id.*, slip op. at 7-8.

Based on this evidence, a Davidson County Criminal Court jury convicted the petitioner of one count of possession with intent to sell 300 grams or more of cocaine and one count of conspiracy to sell 300 grams or more of cocaine. *Id.*, slip op. at 8. The trial court imposed an effective sentence of 50 years' incarceration, and this court affirmed the judgments on direct appeal. *Id.*

On January 13, 2012, the petitioner filed, pro se, a timely petition for post-conviction relief. Following the appointment of counsel, the post-conviction court held an evidentiary hearing on April 14, 2014.

The petitioner testified that he had suffered from multiple sclerosis since 2000 and that the disease affected his short-term memory. The petitioner recalled that trial counsel visited him once while he was incarcerated with respect to a bond hearing and that he did not see trial counsel again until he informed the petitioner that he was withdrawing from his case. According to the petitioner, trial counsel's stated reason for attempting to withdraw was the petitioner's "heading for an ambush or something like that." The trial court did not permit trial counsel to withdraw, and he remained the petitioner's attorney.

The petitioner testified that, although he had a copy of the transcripts of the wiretapped telephone calls, trial counsel never reviewed the recordings with him. The petitioner had the impression that trial counsel had never listened to the recordings or read the transcripts "because [trial counsel] was never aware of anything that was in the transcripts." According to the petitioner, he expressed in the first recorded call with Mr. Smith "that we wanted to do numbers," which the petitioner explained meant gambling and not drug dealing.

On the morning of his trial, the petitioner believed he was arriving for a suppression hearing "because that was the main thing that I kept stressing to [trial counsel] by letters in the mail and the messages I left with whoever works in his office." However, prior to the start of the trial, trial counsel informed the trial court that the petitioner "wanted a suppression motion but [trial counsel] did not believe there was a legal basis for filing it," so the case proceeded to trial.

On cross-examination, the petitioner admitted that "some of the things on the [wiretapped] recording . . . was me." With respect to the cocaine found in Mr. Smith's vehicle, the petitioner stated that he "never physically touched it, saw it, smelled it." The petitioner stated that Officer Lee's testimony that he stopped Mr. Smith for failure to yield to an emergency vehicle was untrue, insisting that "there was no emergency vehicle on the freeway." Although the petitioner wanted trial counsel to object to the officer's testimony on this matter, trial counsel would not do so. According

to the petitioner, he was a passenger in Mr. Smith's car on November 21 because Mr. Smith was going to show the petitioner where his new restaurant was located in Clarksville.

The petitioner explained that he had met Mr. Smith "through a cousin and what they had together was a numbers operation" but that he had never "dealt drugs with" Mr. Smith. The petitioner stated that he was in town on November 21 to see his niece participate in a beauty pageant at the Maxwell House hotel and because he wanted to set up a "numbers" operation with Mr. Smith. The petitioner testified that the transcripts of the wiretapped telelphone conversations contained statements "about numbers, number of books, number of pads, throwing number pads away and things of that nature" and that he wanted that testimony to be introduced at trial but that trial counsel failed to do so.

The petitioner admitted that he had a prior misdemeanor conviction involving marijuana and that he had previously served a 10-year sentence in Georgia in a robbery and assault case. The petitioner acknowledged that he had turned down an offer of 18 years' incarceration in the instant case.

Trial counsel testified that he provided the petitioner with all of his discovery materials, including the transcripts of the wiretapped telephone conversations. Trial counsel recalled "a number of discussions" with the petitioner regarding "the calls that both were involved with him and other people's calls." With respect to the petitioner's interest in placing his gambling involvement before the jury, trial counsel recalled that he had "discussed the difficulty of presenting to a jury, you know, I wanted to be involved in Felony A and got involved in Felony B, that seems very difficult." Trial counsel admitted that he had not used any of the transcribed telephone calls that referenced "books" as part of the petitioner's defense.

Trial counsel stated that the State initially made a plea offer to the petitioner of 15 years to be served at 30 percent but that the offer was rescinded when the petitioner failed to appear at a scheduled status hearing. The State later made a second offer of 17 years, and trial counsel opined that the petitioner "absolutely positively should have taken the [plea] offer" because, at the time the State made the offer, the State was unaware that the petitioner had a criminal history in the state of Georgia. Trial counsel made the petitioner "sign a statement saying I'm aware of this offer and I'm refusing this offer." After the State learned of the petitioner's criminal history, no further plea offers were made to the petitioner.

With respect to the petitioner's desire to file a motion to suppress, trial counsel explained as follows:

[T]here was a wiretap, there is discussion about bringing us four, there is photographs of my client leaving the hotel with a bag that turns out to have three boxes that contained four packages of drugs in the amount requested, they are in his possession and in his bag at the time of the traffic stop. I researched – I can't tell you right offhand the cites, the cases, that we looked at but we didn't believe that there was a legal basis for suppressing the stop.

. . . .

And I knew the officer was going to testify about the – it was something about an emergency vehicle or something to that effect.

Trial counsel testified that he believed failure to yield to an emergency vehicle was a valid reason for the traffic stop. Trial counsel stated that he could not recall whether he had researched the issue of whether the search of Mr. Smith's vehicle "exceed[ed] the purpose of the stop." Trial counsel acknowledged, however, that exigent circumstances could have justified the warrantless stop and search.

With this evidence, the post-conviction court denied relief, specifically accrediting trial counsel's testimony over that of the petitioner's. The court found that "a suppression motion would not have been successful in this matter" and that the petitioner had accordingly failed to show that trial counsel was ineffective in his decision not to file such a motion. With respect to the petitioner's claim that trial counsel should have used the telephone recordings to prove that the petitioner was actually involved in a gambling operation rather than drug dealing, the post-conviction court noted trial counsel's testimony that it would be better "to not illustrate [p]etitioner's involvement with additional felonious activity" because "a jury might consider [p]etitioner to be prone to participation in criminal activity," an implication that trial counsel wished to avoid. The post-conviction court opined that "such a strategy was highly prudent considering the circumstances." The post-conviction court found that trial counsel "zealously represented the [p]etitioner throughout the proceedings, attempting [to] exonerate his client with legal aptitude and efficiency."

On appeal, the petitioner reiterates his claim of ineffective assistance of counsel, contending that trial counsel was ineffective by failing to file a motion to suppress the evidence found in the search of Mr. Smith's vehicle and by failing to prove

the petitioner's involvement in gambling as an alternative theory of his business dealings with Mr. Smith.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d

762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the trial court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record unquestionably supports the post-conviction court's denial of relief. With respect to trial counsel's failure to seek suppression of the items seized following the search of Mr. Smith's vehicle, such a tactical decision was clearly made after adequate preparation on the part of trial counsel, given, among other things, that the petitioner had no standing to challenge the search of a vehicle that did not belong to him, and we will not second-guess this reasonable trial strategy. *See Adkins*, 911 S.W.2d at 347. Likewise, trial counsel's decision to eschew proof that the petitioner was involved in an illegal – and felonious – gambling operation was certainly a reasonable one. *See id.* As such, we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

The petitioner failed to establish that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE